Sheri Pan (SBN 316136)
sheri@zwillgen.com
ZWILLGEN LAW LLP
369 Pine Street, Suite 506
San Francisco, CA 94104
Telephone: (415) 590-2335

Attorney for Defendant
**YANKA INDUSTRIES, INC. d/b/a MASTERCLASS**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| REBEKKA LIEN,<br><br>*Plaintiff*,<br><br>v.<br><br>YANKA INDUSTRIES, INC. d/b/a MASTERCLASS,<br><br>*Defendant.* | Case No. 3:24-cv-08007-TLT<br><br>**DEFENDANT YANKA INDUSTRIES, INC. d/b/a MASTERCLASS'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS**<br><br>Judge: Hon. Trina L. Thompson<br>Hearing Date: TBD<br>Time: 2:00 p.m.<br>Courtroom: 9, 19th Floor |

**TO THE COURT AND ALL PARTIES OF RECORD:**

**PLEASE TAKE NOTICE THAT** on a date set by the Court, this matter may be heard, before the Honorable Trina L. Thompson in Courtroom 9 of this Court, located on the 19th Floor of the San Francisco Courthouse, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant Yanka Industries, Inc. d/b/a MasterClass's ("MasterClass") will, and hereby does, move the Court for an order granting its Motion to Dismiss the First Amended Complaint. This Motion is based on Federal Rule of Civil Procedure 12(b)(6) on the grounds that Plaintiff's allegations fail to state any valid claim. This Motion will be based upon this Notice; the accompanying Memorandum of Points and Authorities; the complete record in this action; and such other matters and arguments as may come before the Court, including those raised in connection with reply briefing and oral argument relating to this Motion.

Dated: February 25, 2025

**ZWILLGEN LAW LLP**

By: *_/s/ Sheri Pan_*
Sheri Pan (SBN 316136)
sheri@zwillgen.com

**Attorney for Defendant**
Yanka Industries, Inc. d/b/a MasterClass

# TABLE OF CONTENTS


I. INTRODUCTION ........ 1

II. FACTUAL ALLEGATIONS ........ 3

A. MasterClass's Website and Subscriptions ........ 3

B. The Facebook Pixel ........ 4

C. Plaintiff's Experience ........ 5

III. LEGAL STANDARD ........ 5

IV. ARGUMENT ........ 6

A. Plaintiff Is Not a VPPA Consumer. ........ 6

1. The FAC does not allege Plaintiff subscribed to MasterClass's video products or services. ........ 6

a. The VPPA only applies to consumers of audiovisual materials. ........ 6

b. Plaintiff does not allege that her Website "subscription" provided her with any video-related benefits. ........ 12

2. The FAC does not allege the basic elements of a subscriber relationship between herself and MasterClass. ........ 14

B. Plaintiff Does Not Allege a Knowing Disclosure of PII. ........ 17

V. CONCLUSION ........ 21

## TABLE OF AUTHORITIES

**Cases** Page(s)

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................5, 6

*Austin-Spearman v. AMC Network Ent. LLC*,
98 F. Supp. 3d 662 (S.D.N.Y. 2015)....................17

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................5

*Borden v. eFinancial, LLC*,
53 F.4th 1230 (9th Cir. 2022)....................9

*Brown v. Learfield Commc'ns, LLC*,
No. 1:23-cv-00374-DAE, 2024 WL 3676709 (W.D. Tex. June 27, 2024)....................7

*California River Watch v. City of Vacaville*,
39 F.4th 624 (9th Cir. 2022)....................11

*Carroll v. Gen. Mills, Inc.*,
CV 23-1746 DSF (MRWx), 2023 WL 6373868 (C.D. Cal. Sept. 1, 2023)....................8

*Carter v. Scripps Network, LLC*,
670 F.Supp.3d 90 (S.D.N.Y. Apr. 24, 2023)....................8

*Dolan v. U.S. Postal Serv.*,
546 U.S. 481 (2006)....................12

*Edwards v. Learfield Commc'ns, LLC*,
697 F. Supp. 3d 1297 (N.D. Fla. 2023)....................8

*Edwards v. Learfield Commc'ns, LLC*,
No. 1:23-cv-00065, ECF No. 84 (N.D. Fla. July 22, 2024)....................7

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017)....................9, 18, 19, 21

*Ellis v. Cartoon Network, Inc.*,
803 F.3d 1251 (11th Cir. 2015)....................14-15, 16, 17

*Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*,
554 U.S. 33 (2008)....................10

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000)....................7

*Gardener v. MeTV*,
681 F. Supp. 3d 864 (N.D. Ill. 2023) .......... 8, 13, 16

*Gardner v. MeTV*,
No. 22 CV 5963, 2024 WL 779728 (N.D. Ill. Feb. 15, 2024) .......... 8

*Ghanaat v. Numerade Labs, Inc.*,
689 F. Supp. 3d 714 (N.D. Cal. 2023) .......... 19

*Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*,
559 U.S. 280 (2010) .......... 7

*Guenther v. Lockheed Martin Corp.*,
972 F.3d 1043 (9th Cir. 2020) .......... 21

*Heather v. Healthline Media, Inc.*,
No. 3:22-CV-05059-JD, 2023 WL 8788760 (N.D. Cal. Dec. 19, 2023) .......... 7, 8-9, 11, 13

*Heather v. Healthline Media, Inc.* (*Heather II*),
No. 3:22-cv-05059-JD, 2024 WL 5401593 (N.D. Cal. June 7, 2024) .......... 8

*Heerde v. Learfield Commc'ns, LLC*,
741 F. Supp. 3d 849 (C.D. Cal. 2024) .......... 19

*Hernandez v. Container Store, Inc.*,
No. 2:23-CV-05067-HDV-RAO, 2024 WL 72657 (C.D. Cal. Jan. 3, 2024) .......... 7

*Hunthausen v. Spine Media, LLC*,
678 F. Supp. 3d 1228 (S.D. Cal. 2023) .......... 8

*In re Hulu Priv. Litig.*,
86 F. Supp. 3d 1090 (N.D. Cal. 2015) .......... 17-18, 20

*In re Hulu Priv. Litig.*,
No. C 11-03764 LB, 2014 WL 1724344 (N.D. Cal. Apr. 28, 2014) .......... 18

*In re Nickelodeon Consumer Priv. Litig.*,
827 F.3d 262 (3d Cir. 2016) .......... 19

*Intel Corp. Inv. Pol'y Comm. v. Sulyma*,
589 U.S. 178 (2020) .......... 21

*King v. Burwell*,
576 U.S. 473 (2015) .......... 7

*Kuzenski v. Uproxx LLC*,
No. 2:23-cv-00945-WLH-AGR, 2023 WL 8251590 (C.D. Cal. Nov. 27, 2023) .......... 8, 12-13

*Kuzenski v. Uproxx LLC*,
No. 2:23-CV-00945-WLH-AGR, 2024 WL 5323420 (C.D. Cal. June 24, 2024)..............8, 15

*M.K. v. Google LLC*,
No. 21-CV-08465-VKD, 2023 WL 4937287 (N.D. Cal. Aug. 1, 2023) ...............................20

*Markels v. AARP*,
689 F. Supp. 3d 722 (N.D. Cal. 2023)..........................................................................8, 13

*Mendoza v. Caesars Ent., Inc.*,
No. 23-CV-03591, 2024 WL 2316544 (D.N.J. May 22, 2024)..........................................7, 13

*Merit Mgmt. Group, LP v. FTI Consulting, Inc.*,
583 U.S. 366 (2018)..........................................................................................................10

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
572 U.S. 545 (2014)............................................................................................................7

*Pileggi v. Wash. Newspaper Publ'g Co.*,
No. CV 23-345 (BAH), 2024 WL 324121 (D.D.C. Jan. 29, 2024)..........................................8

*Rodriguez v. JP Boden Servs. Inc.*,
No. 23-CV-00534-L-VET, 2024 WL 559228 (S.D. Cal. Feb. 12, 2024).................................7

*Rudisill v. McDonough*,
601 U.S. 294 (2024)..........................................................................................................10

*Salazar v. National Basketball Ass'n*,
118 F.4th 533 (2d Cir. 2024) ............................................................................................10

*Salazar v. Paramount Glob.*,
683 F. Supp. 3d 727 (M.D. Tenn. 2023)...............................................................................8

*Sutton v. TED Found., Inc.*,
No. 23 CIV. 9219 (DEH), 2024 WL 4167342 (S.D.N.Y. Sept. 12, 2024)........................ 15-17

*Tawam v. Feld Ent. Inc.*,
684 F. Supp. 3d 1056 (S.D. Cal. 2023)..........................................................................7, 14

*Tovar v. Sessions*,
882 F.3d 895 (9th Cir. 2018) ..............................................................................................7

*Warren v. Fox Fam. Worldwide, Inc.*,
328 F.3d 1136 (9th Cir. 2003) ......................................................................................... 5-6

*United States ex rel. Harper v. Muskingum Watershed Conservancy Dist.*,
842 F.3d 430 (6th Cir. 2016) ............................................................................................20

*United States v. Morris*,
928 F.2d 504 (2d Cir. 1991) ....................20

*United States v. Williams*,
553 U.S. 285 (2008)....................11

*Yates v. United States*,
574 U.S. 528 (2015)....................9, 11, 12

*Yoder v. Ingersoll-Rand Co.*,
31 F. Supp. 2d 565 (N.D. Ohio 1997) ....................18

**Statutes**

10 U.S.C. § 949p-5 ....................19

15 U.S.C. § 6821....................19

18 U.S.C. § 2710....................1

18 U.S.C. § 2710(a) ....................6, 7, 9, 11, 17

18 U.S.C. § 2710(b)....................6, 10, 20

42 U.S.C. § 6972....................11

**Rules**

Fed. R. Civ. P. 8....................6

Fed. R. Civ. P. 12....................5

# I. INTRODUCTION

In recent years, a legion of plaintiffs' firms have sought to revive the long-dormant Video Privacy Protection Act, 18 U.S.C. § 2710 (the "VPPA") by bringing suits against nearly every type of website that offers some video component and uses the Facebook Pixel. The Facebook Pixel is a piece of technology embedded on websites that interacts with Facebook cookies installed on a Facebook user's browser. If users are logged into Facebook when they visit a webpage that features a Facebook Pixel, specific information about that visit may be shared with Facebook, such as the user's Facebook ID and information about which webpages on the site they visited. Many businesses have been sued under the same theory: that sending this information to Facebook when the page visited includes some sort of video content violates the VPPA. At a high level, the VPPA generally prohibits video tape service providers from disclosing the personal information of a consumer (i.e. a purchaser or someone with an established relationship to receive videos from the provider), along with the specific videos they viewed, purchased, or rented, to a third party, absent a statutory exception. Some cases have survived motions to dismiss where plaintiffs can allege that they *subscribed to a defendant's video services*, gained access to videos as a result, and their viewing choices were then transmitted to Facebook via the Facebook Pixel.

But Plaintiff's claims do not fit this mold. She does not allege that she subscribed to any *video* products or services that Defendant Yanka Industries, Inc. d/b/a MasterClass's ("MasterClass") offers only to its *paying* customers. Instead, she bases her VPPA claim on the fact that she was able to log into the MasterClass website, www.masterclass.com, using her Facebook credentials (which she claims makes her a "subscriber" to the website) and then accessed video material on the MasterClass website that is freely and equally available to any person with internet access (whether or not they have also registered on the MasterClass website). Under these basic facts, Plaintiff does not and cannot allege the necessary elements of a VPPA claim. Specifically, she cannot allege that she is a "consumer" under the statute or that there was a "knowing disclosure" of her personal information to Facebook.

**First**, Plaintiff is not a VPPA "consumer." As *every* court in this district to address the question has concluded, the plain language of the VPPA makes clear that to be a statutory

"consumer," a plaintiff must rent, buy, or subscribe to a defendant's *video* goods or services. Here, Plaintiff does not allege that her so-called "subscription" to the MasterClass website provided her with any enhanced or exclusive access to MasterClass's audiovisual goods or services. While she alleges that she was able to "register" for the website, she does not allege that her access to the "free" video content on MasterClass's website was any different from any other visitor to the site, whether registered or not. Thus, even if Facebook collected information when Plaintiff accessed free video content on MasterClass's website, she is not a VPPA consumer and cannot state a claim for relief.

Moreover, even if the VPPA did not require a factual nexus between a subscription and the defendant's video products or services, Plaintiff does not allege facts plausibly showing that she has any "subscriber" relationship to MasterClass. Caselaw uniformly requires that a VPPA "subscription" evidence factors showing a durable relationship between a plaintiff, on the one hand, and the defendant, on the other. Here, Plaintiff only alleges she was able to "register" for the MasterClass website. But she does not allege that "registration" kicked off any commitments from her to MasterClass, or from MasterClass to her. Nor does she allege any of the other factors that courts use to determine whether a "subscription" exists. Thus, under any standard, she is not a statutory consumer.

**Second**, Plaintiff does not plausibly allege that MasterClass knowingly disclosed PII to Facebook. Plaintiff's claim depends on MasterClass's alleged and knowing transmission of her Facebook IDs in connection with a record of the videos she watched on the Website. But the FAC pleads no actual factual content suggesting that happened. The FAC does not allege that MasterClass had any way of accessing Plaintiff's Facebook ID in the first instance; thus, Plaintiff does not allege that MasterClass could have disclosed it. The VPPA does not create a strict liability standard for passively "causing" a disclosure; it requires affirmative knowledge on behalf of the disclosing party. That is not alleged here.

The VPPA is an important privacy statute that protects a specific category of consumers from a certain kind of disclosure. Plaintiff is not within that category. Nor does she otherwise plead the required elements of a VPPA claim. Her lawsuit should be dismissed.

## II. FACTUAL ALLEGATIONS

### A. MasterClass's Website and Subscriptions

Plaintiff accurately describes the MasterClass website and app as "***a paid subscription streaming website*** that offers a wide range of classes through audio and prerecorded video lessons, curriculum, and workbooks." (First Amended Complaint ("FAC") ¶ 21 (emphasis added).) To access MasterClass's paid-for subscription services, "users provide payment information to Defendant along with their personal information, including their name, email address, zip code, and phone number." (*Id.* ¶ 23.) Individuals that use MasterClass's "paid membership options . . . have access to a variety of ***exclusive*** prerecorded Video Media on Defendant's digital platforms." (*Id.* ¶ 27 (emphasis added).) These video materials are inaccessible to anyone other than *paying* MasterClass subscribers. Although she did not buy a subscription herself, Plaintiff alleges that when any paying subscriber "signs in and watches masterclass.com Video Media," his or her PII is shared with Facebook. (*Id.* ¶ 28.) That allegation is false: MasterClass's website *does not* transmit any information to Facebook concerning the paid video content that paying MasterClass subscribers access on the website.[1] To this end, Plaintiff alleges that "Defendant could easily program its website . . . to prevent its users' [PII] from being automatically transmitted to Facebook when a subscriber views Video Media." (*Id.* ¶ 35.) Ironically, MasterClass has done exactly that for its paying subscribers: users that access its "paid subscription service" do not have any viewing information transmitted to Facebook.[2]

Plaintiff also alleges that *non-paying* website users can use a "quick registration [process] by signing-in [to the MasterClass website] with Google and Facebook accounts, which automatically shares users' emails" and other "personal information," including IP addresses, with MasterClass.

---

[1] The FAC confusingly alleges that the Facebook Pixel is present both on MasterClass's website and app, and that both cause transmissions of data to Facebook. (*See*, *e.g.*, FAC ¶ 47.) But as the FAC itself acknowledges, the Facebook Pixel is a tool that *only* works with websites – not mobile applications. (*See* FAC ¶ 4.) Still, because the FAC occasionally alleges that the Facebook Pixel identically operates on the MasterClass website *and* app, MasterClass incorporates all the arguments made herein as applicable to Plaintiff's allegations about both the website and the MasterClass app.

[2] All paying MasterClass subscribers also agree to MasterClass's terms of use, which explain its data sharing practices and also that require any disputes be resolved through individual arbitration – not via class action lawsuits.

(*Id.* ¶¶ 24, 25.) She does not allege that these users' Facebook IDs are provided to MasterClass. She does not allege that these users agree to MasterClass's terms of use or any other binding contract. She does not allege that this process costs any money. She does not allege that MasterClass makes any commitments towards these users, such as a promise to continue providing them with any benefits in exchange for their registration. The FAC alleges that these "quick registrants"—a category of users that she labels as free "subscribers"—receive "exclusive benefits," but Plaintiff does not allege what those benefits are. (FAC ¶ 46.) Critical to her VPPA claim, she *does not allege* that these registrants receive any *video-related* benefits from MasterClass whatsoever. Instead, the FAC alleges that these individuals are able to access the "broad selection of . . . free prerecorded video content" on the MasterClass website, which Plaintiff does not dispute is freely and equally accessible to every single visitor to the MasterClass website—whether registered or not. (FAC ¶ 14.)

**B. The Facebook Pixel**

Plaintiff alleges that the MasterClass website uses a "Facebook tracking pixel" (the "Facebook Pixel"). (*Id.* ¶ 32.) When the Facebook Pixel is installed on a webpage that features video content, Plaintiff alleges that it causes "the website [to send] to Facebook certain information about the viewer, including . . . their identity and the media content . . . watched."[3] (*Id.* ¶ 33.) The FAC explains that this disclosure is not made by the MasterClass website, but by "the user's browser" when the user accesses the MasterClass website "while logged into her Facebook account." (*Id.* ¶¶ 13, 34.) These alleged disclosures include "the video content name [accessed by a user], its URL, and . . . the viewers' Facebook ID." (*Id.* ¶ 34.) This allegation is also false: the MasterClass website uses the Facebook Pixel on certain freely accessible webpages (i.e., not those accessible only to paying users) and, in those cases, only transmits the URLs and names of the webpages visited.

The FAC alleges that Facebook IDs are unique identifiers linked to individual Facebook users. (*Id.* ¶ 36.) Plaintiff alleges that Facebook can identify its own users using a Facebook ID. (*Id.*) The FAC alleges that "Facebook admits" that an "ordinary person" can also use a Facebook ID to

[3] Once again, these disclosures do *not* occur for any video content that can only be accessed by MasterClass's *paying* subscribers.

positively identify a Facebook user, presumably because of Facebook's "Real Name Policy," which requires users to use their "authentic name . . . on their [Facebook] profiles." (*Id.* ¶¶ 34, 36.)

### C. Plaintiff's Experience

Plaintiff alleges that on or around 2020, she "use[d] her Facebook account to log in to the *masterclass.com* website and iPhone App," (*id.* ¶ 13), via the "quick registration" process discussed above, (*id.* ¶ 24). Although she refers to herself as a "subscriber," she does not allege that she ever entered into a paid subscription with MasterClass. Thus, she does not allege that she could ever access the "exclusive prerecorded Video Media" MasterClass offers only to its paying subscribers. (*Cf. id.* ¶¶ 21, 27.) These allegations mark the key difference between Plaintiff's original complaint and the FAC. In the former, Plaintiff alleged that she "became a paid digital subscriber of masterclass.com by providing payment to Defendant and start[ing] her masterclass.com subscription, which granted her exclusive access to view prerecorded video and media content on Defendant's website." (Dkt. 1 at ¶ 44.) But in the FAC, Plaintiff removed any allegations suggesting that she was either paying MasterClass subscriber or that she could access any enhanced or exclusive video content on MasterClass's website.

Instead, Plaintiff alleges that she accessed the "free" video content available on MasterClass's website, which resulted in Facebook "connect[ing] Plaintiff's identity to the specific prerecorded videos [s]he watched." (*Id.* ¶ 47.) She does not allege that MasterClass provided that free video content exclusively to free "subscribers" like her, or that her access to the free video content was any different than that provided to any random or first time Website visitor. She does allege that her "subscription" gave her "other exclusive benefits," but she does not say what those are. (*See id.* ¶ 46.)

## III. LEGAL STANDARD

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The rule that a court accept as true allegations in a complaint is "inapplicable to legal conclusions," *id.*, and "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Warren v. Fox Fam. Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003) (citation omitted) ("We do not ...

necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations."). Nor should a court "accept as true conclusory allegations which are contradicted by documents referred to in the complaint." *Id.* Dismissal is warranted where the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

## IV. ARGUMENT

### A. Plaintiff Is Not a VPPA Consumer.

The VPPA is a federal privacy statute that protects a specific class of individuals. To state a claim under the VPPA, a plaintiff must be a statutory "consumer" of a "video tape service provider." 18 U.S.C. § 2710(b)(1). A "consumer" is "any renter, purchaser, or subscriber of goods or services from a video tape service provider." *Id.* § 2710(a)(1). Plaintiff does not contend she rented or purchased anything from MasterClass, so her VPPA claim turns on whether she plausibly alleges she is a "subscriber of goods or services from a video tape service provider." The FAC does not make this showing because (i) Plaintiff does not allege she subscribed to any of MasterClass's *video* goods or services and (ii) Plaintiff does not allege her basic registration with the MasterClass website created any sort of durable relationship with MasterClass.

#### 1. The FAC does not allege Plaintiff subscribed to MasterClass's video products or services.

Plaintiff does not allege she subscribed to MasterClass's *video* products or services. As many, many courts have held when analyzing nearly identical fact patterns, that shows Plaintiff is *not* a VPPA "subscriber" and, in turn, cannot state a claim under the Act.

##### a. *The VPPA only applies to consumers of audiovisual materials.*

District courts have regularly concluded that the plain text of the VPPA requires a factual nexus between a plaintiff's subscription and a defendant's audiovisual goods or services. The statute protects a specific category of information: personal information concerning requests for or the receipt of audiovisual materials. 18 U.S.C. § 2710(a)(3). It applies to a specific category of businesses: those that rent, sell, or deliver audiovisual materials. *Id.* § 2710(a)(4). And it protects a specific category of people: those who rent, purchase, or subscribe to audiovisual materials. *Id.*

§ 2710(a)(1). This purpose is reflected in the statute's text and structure, and maps precisely onto the situation that led to the VPPA's enactment and addresses the problem Congress wanted to solve: protecting the privacy of the video viewing choices made by individuals that rent (or buy or subscribe to) audiovisual content from entities in the business of supplying such materials.

Statutory interpretation "begins and ends with the text." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553 (2014). It is a "fundamental canon of statutory construction" to define words in reference to "context" and "the overall statutory scheme." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132-33 (2000) (citation and internal quotation marks omitted). A court must "give faithful meaning to the language Congress adopted in the light of the evident legislative purpose in enacting the law in question." *Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 298 (2010) (citation omitted). Accordingly, "[w]hen interpreting the language of a statute [the Court does] not look at individual subsections in isolation;" rather, the Court "must read the words in their context and with a view to their place in the overall statutory scheme." *Tovar v. Sessions*, 882 F.3d 895, 901 (9th Cir. 2018) (quoting *King v. Burwell*, 576 U.S. 473, 486 (2015)).

A "litany of decisions" addressing this issue have reached a consistent interpretation of the VPPA's plain statutory text and concluded that the VPPA only applies to consumers of *audiovisual* materials, rather than any products or services offered by a defendant. *Hernandez v. Container Store, Inc.*, No. 2:23-CV-05067-HDV-RAO, 2024 WL 72657, at *3 (C.D. Cal. Jan. 3, 2024); *see also Tawam v. Feld Ent. Inc.*, 684 F. Supp. 3d 1056, 1061 (S.D. Cal. 2023) ("Courts have further required the existence of a factual nexus or relationship between the subscription provided by the defendant and the defendant's allegedly actionable video content.").[4] As Judge Donato recently summed up

---

[4] *See also*, *e.g.*, *Heather v. Healthline Media, Inc.*, No. 3:22-CV-05059-JD, 2023 WL 8788760, at *2 (N.D. Cal. Dec. 19, 2023); *Rodriguez v. JP Boden Servs. Inc.,* No. 23-CV-00534-L-VET, 2024 WL 559228, at *5 (S.D. Cal. Feb. 12, 2024); Order, *Edwards v. Learfield Commc'ns, LLC*, No. 1:23-cv-00065, ECF No. 84, at 4-7 (N.D. Fla. July 22, 2024), *appeal dismissed*, No. 24-12697 (11th Cir. Nov. 22, 2024); *Brown v. Learfield Commc'ns, LLC*, No. 1:23-cv-00374-DAE, 2024 WL 3676709, at *2 (W.D. Tex. June 27, 2024), *appeal dismissed*, No. 24-50632 (5th Cir. Nov. 13, 2024); *Mendoza v. Caesars Ent., Inc.*, No. 23-cv-03591, 2024 WL 2316544, at *5-6 (D.N.J. May 22, 2024); *Hernandez v. Container Store, Inc.*, No. 2:23-cv-05067-HDV-RAO, 2024 WL 72657, at *3 (C.D. Cal. Jan. 3,

when analyzing this same interpretative question, applying the VPPA to subscribers of a business's *non-video* services "would expand the reach of the statute far beyond its plain language and anything Congress contemplated." *Heather v. Healthline Media, Inc.* (*Heather II*), No. 3:22-cv-05059-JD, 2024 WL 5401593, at *1 (N.D. Cal. June 7, 2024); *see also Salazar v. Paramount Glob.*, 683 F. Supp. 3d 727, 744 (M.D. Tenn. 2023), *appeal pending sub nom. Michael Salazar v. Paramount Glob.*, No. 23-5748 (6th Cir. filed Aug. 21, 2023) (emphasis in original) (a claim anchored by an "interaction . . . [that] has nothing to with video content . . . is ill suited for a claim under the *Video* Privacy Protection Act.").

District courts have pointed to different statutory features supporting this commonsense, textual interpretation. For example, the court in *Hunthausen v. Spine Media, LLC* focused on the structural and textual symmetry among the VPPA's definitional sections, which support that a VPPA "consumer" must be a consumer of a defendant's *video* goods or services:

> The definitions of "consumer" and "video tape service provider" are paired to some degree: "renter with rental, purchaser with sale, and subscriber with delivery, all of which subsection (a)(4) applies to audio visual materials. Thus, the scope of a "consumer," when read with sections 2710(b)(1) and (a)(4), is cabined by the definition of "video tape service provider," with its focus on the rental, sale or delivery of audio-visual materials. Section 2710(b)(1) provides for an action by a renter, purchaser of subscriber of audio-visual materials, and not a broader category of consumers."

678 F. Supp. 3d 1228, 1233 (S.D. Cal. 2023) (quoting *Carter v. Scripps Network, LLC*, 670 F. Supp. 3d 90, 98-99 (S.D.N.Y. Apr. 24, 2023)).

In *Heather*, Judge Donato's textual analysis identified similar support in the VPPA's consistent use of the term "services." As the court explained, the statute uses the term "services" in

---

2024); *Edwards v. Learfield Commc'ns, LLC*, 697 F. Supp. 3d 1297, 1305-07 (N.D. Fla. 2023); *Gardener v. MeTV*, 681 F. Supp. 3d 864, 869 (N.D. Ill. 2023); *Gardner v. MeTV*, No. 22 CV 5963, 2024 WL 779728, at *3-4 (N.D. Ill. Feb. 15, 2024), *appeal pending sub nom. David Vance Gardner v. MeTV*, No. 24-1290 (7th Cir. filed Feb. 23, 2024); *Pileggi v. Wash. Newspaper Publ'g Co.*, No. CV 23-345 (BAH), 2024 WL 324121, at *11 (D.D.C. Jan. 29, 2024), *appeal pending sub nom. Nicole Pileggi v. Wash. Newspaper Publ'g Co.*, No. 24-7022 (D.C. Cir. filed Feb. 22, 2024); *Hunthausen v. Spine Media, LLC*, 678 F. Supp. 3d 1228, 1232-33 (S.D. Cal. 2023); *Markels v. AARP*, 689 F. Supp. 3d 722, 728 (N.D. Cal. 2023); *Kuzenski v. Uproxx LLC*, No. 2:23-cv-00945-WLH-AGR, 2023 WL 8251590, at *5 (C.D. Cal. Nov. 27, 2023); *Kuzenski v. Uproxx LLC*, No. 2:23-CV-00945-WLH-AGR, 2024 WL 5323420, at *4 (C.D. Cal. June 24, 2024); *Carroll v. Gen. Mills, Inc.*, CV 23-1746 DSF (MRWx), 2023 WL 6373868, at *4 (C.D. Cal. Sept. 1, 2023).

the sections defining "personally identifiable information" and "consumer," and then in the term "video tape service provider." 2023 WL 8788760, at *2. "Personally identifiable information" protected by the statute concerns "specific video materials or *services* from a video tape *service* provider." 18 U.S.C. § 2710(a)(3) (emphasis added). "Video tape *service* providers" either rent, sell, or deliver "audio visual materials." *Id.* § 2710(a)(4) (emphasis added). And then the "consumers" contemplated by the VPPA are defined in relation to the "goods or *services*" they rent, buy, or subscribe to from covered video tape service providers. *Id.* § 2710(a)(1) (emphasis added). Under the "principle of *noscitur a sociis*—a word is known by the company it keeps—[courts] avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress." *Yates v. United States*, 574 U.S. 528, 543 (2015) (citation and quotation marks omitted). Given the VPPA's statutory features, that the "services" that make an individual a VPPA "consumer" must be the same "services" discussed by the rest of the statute makes intuitive and contextual sense. As Judge Donato reasoned, it would be "'illogical, or very poor legislative drafting,' [for the VPPA to] use the same word, 'service,' in close proximity, while giving it different meanings." *Heather*, 2023 WL 8788760, at *2 (quoting *Borden v. eFinancial, LLC*, 53 F.4th 1230, 1233 (9th Cir. 2022)).

Other features of the statute support this consensus interpretation as well. For example, when defining "consumer," the terms "purchaser" and "subscriber" appear in a list that starts with "renter." 18 U.S.C. § 2710(a)(1). In the video store context that Congress was focused on when it enacted the VPPA in the late 1980s, renting had a clear and specific connotation: one rents videos, not candy or tote bags or any of the other goods or services that a video store might provide. The accompanying terms "purchaser" and "subscriber"—which take the same object, "goods or services"—are most naturally understood to have the same scope: one is a "purchaser" or "subscriber" under the VPPA only if what one purchases or subscribes to is the same sort of thing that a person in 1988 ordinarily and commonly rented from a video store: videos. Consistent with the Ninth Circuit's discussion of the statute, this interpretation aligns "most neatly with the regime that the VPPA's enacting Congress likely had in mind." *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017).

The title of the VPPA's liability section, which covers the disclosure of "*Video tape* rental and sale records," 18 U.S.C. § 2710(b) (emphasis added), is more contextual evidence of the VPPA's consistent statutory scheme. *See Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008) ("[S]tatutory titles and section headings 'are tools available for the resolution of a doubt about the meaning of a statute.'") (citation omitted). Like the definitional scope conveyed by the terms "renter, purchaser, and subscriber," Section 2710(b)'s title reflects that Congress intended to create enforceable privacy rights with respect to purchases or rentals reflected in and created by a video tape service provider's "*[v]ideo tape* rental and sales records." 18 U.S.C. § 2710(b)(1); *see Rudisill v. McDonough*, 601 U.S. 294, 309 (2024) (quoting *Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*, 583 U.S. 366, 380, (2018)) ("Section headings supply cues as to what Congress intended[.]") (cleaned up). If the term "consumer," which also appears in Section 2710(b), is interpreted to mean something *other than* a renter, buyer, or subscriber to a business's "*video tape*" rental, sale, or delivery services, then the title of the statue's liability provision must be ignored. But if "consumer" is interpreted to mean a consumer of *video tape* services, then Section 2710(b)'s title, along with the rest of the statute, maintain a uniform focus.

As Plaintiff may note, the Second Circuit broke from this consensus interpretation and offered its own expansive interpretation of the VPPA in *Salazar v. National Basketball Ass'n*, 118 F.4th 533 (2d Cir. 2024), holding that Congress intended the term "consumer" to cover *all of* a business's renters, purchasers, and subscribers, regardless of whether they rented, purchased, or subscribed to the business's video offerings. *Id.* at 546-47. With all due respect to the Second Circuit – whose decisions are not binding on courts in this district – the *Salazar* decision cannot be squared with the "plain language" interpretation of the VPPA followed by courts in this and other districts and, for the reasons discussed above, should not be followed.[5] Most notable for this case is that the *Salazar* analysis conflicts with the Ninth Circuit's basic *contextual* approach to statutory

---

[5] While *Salazar* is the first appellate decision on this issue, others will be issued shortly. The Ninth Circuit will consider the definition of the term "consumer" and "subscriber" in *Heather v. Healthline Media, Inc.*, No. 24-04168 (9th Cir.), which is fully briefed and scheduled for oral argument this summer. The consumer issue is also on appeal before the Sixth, Seventh, Tenth, and D.C. Circuits.

interpretation—making it likely the Ninth Circuit will agree with the district court decisions in this and other Circuits, rather than a single outlier from the Second Circuit.

In *California River Watch v. City of Vacaville*, 39 F.4th 624 (9th Cir. 2022), for example, the Ninth Circuit considered the Resource Conservation and Recovery Act's ("RCRA") authorization of lawsuits "against any person . . . who has contributed or who is contributing to the past or present . . . transportation" of hazardous materials. 42 U.S.C. § 6972(a)(1)(B). In construing the term "transportation," the Court acknowledged that, standing alone, the term's dictionary definition would cover any "action or process of transporting" or "carry[ing] from one place to another." *Cal. River Watch*, 39 F.4th at 630. Because the RCRA used the broad and unqualified term "transportation" when defining the scope of the Act and who is subject to suit, the Court acknowledged – analogous to the approach taken by the Second Circuit in *Salazar* (and in line with the one taken by Plaintiff here) – that the plain definition of the term would seem to cover "any party who moves . . . waste." *Id.* But after considering the term "transportation" in the *context* of the RCRA, including "the specific context in which [the] language is used, and the broader context of the statute as a whole," the Ninth Circuit assigned a narrower meaning. *Id.* (quoting *Yates*, 574 U.S. at 537). Specifically, the Court recognized that the RCRA repeatedly used a "more nuanced meaning of transportation" throughout the statute in a manner consistent with the overall statutory scheme. *Id.* at 631. That included the RCRA's use of the term "transportation" in close proximity to the term "transporter," *id.* at 632 (quoting *United States v. Williams*, 553 U.S. 285, 294 (2008)), which supported that "transportation" referenced transportation actions taken by "participants in the waste disposal process" rather than any conceivable movement of waste from one place to another, *id.*

Applied here, this statutory approach squares precisely with Judge Donato's interpretative analysis in *Healthline*. Much like the RCRA's use of the term "transportation," when considered in context, the VPPA's statutory text provides "sound reason" to construe the term "services" as referencing the same "services" that (i) qualify a business as a video tape service provider, 18 U.S.C. § 2710(a)(4), (ii) are protected from disclosure, *id.* § 2710(a)(3), and (iii) establish who is protected by the statute, id. § 2710(a)(1). *See Heather*, 2023 WL 8788760, at *2. In short, interpreting the VPPA to require that a person buy, rent, or subscribe to the same audiovisual services the VPPA

regulates presents a consistent, contextual reading of the statute. *See*, *e.g.*, *Yates*, 574 U.S. at 536 (holding that statutory term "tangible object," in context, "is better read to cover only objects one can use to record or preserve information, not all objects in the physical world"); *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006) (holding that statutory term "negligent transmission," in context, requires a "narrower reading" than "the outer limits of its definitional possibilities," so that it "does not go beyond negligence causing mail to be lost or to arrive late, in damaged condition, or at the wrong address"). And with respect to the *Salazar* decision, the prevailing view in this Circuit avoids interpreting a single word *outside* the statutory context in a manner that is inconsistent with the overall statutory scheme.

**b. *Plaintiff does not allege that her Website "subscription" provided her with any video-related benefits.***

Because the FAC does not allege that Plaintiff's free "subscription" provided her with any *video* access or viewing benefits beyond what any non-registered visitor to the MasterClass website could access or watch, she is not a VPPA "subscriber" and, thus, cannot state a VPPA based on the free video content she accessed.

Several courts have addressed these same allegations and reached the same conclusion. *Kuzenski* is on point. There, the plaintiff alleged that the defendant's website included a significant amount of video content. *Kuzenski*, 2023 WL 8251590, at *1. And there, as here, the plaintiff alleged that users could freely "subscribe" to the defendant's website by using their Facebook credentials, or by creating a display name and providing an email address. *Id.* While the plaintiff alleged that these "subscriptions" provided users with certain "social media type benefits, such as a user profile, avatars, and ability to communicate with other users," he did not allege that these free "subscriptions" provided users with any special access to the defendant's video content. *Id.* at *5. The *Kuzenski* plaintiff then alleged—exactly as Plaintiff alleges here—that when he accessed video content on the defendant's website, information about his website activity was transmitted to Facebook via the Facebook Pixel. *Id.* at *2. On review, Judge Hsu found that these allegations did not allege a VPPA "subscription." Consistent with the consensus interpretative approach addressed above, the court found that because the plaintiff did not allege his "account" or "subscription" to the defendant's

website was "connected in any way to Defendant's video content," the plaintiff "fail[ed] to allege a factual nexus or relationship between the subscription (i.e., Website benefits) and the Defendant's allegedly actionable video content." *Id.* at *5. The court also rejected the plaintiff's argument that he was "a subscriber to Defendant's entire website, of which a large focus is audio visual materials" because "[n]owhere in the FAC [did the] Plaintiff allege that becoming a subscriber [was] connected in any way to Defendant's video content." *Id.*

Other courts have reached the same conclusion in cases alleging a plaintiff maintained an account or subscription on a defendant's website that did not provide any video benefits beyond those afforded to any other website visitor. *See*, *e.g.*, *Markels*, 689 F. Supp. 3d at 728 (holding that plaintiffs were not subscribers where "plaintiffs [did] not allege that they needed to provide their information or payment to access AARP's videos . . . [which were] readily available to anyone who visits the site."); *Gardener*, 681 F. Supp. 3d at 869 ("The Court does not agree, however, with Plaintiffs' argument that the allegations that [they] opened an account separate and apart from viewing video content on MeTV's website is sufficient to render them 'subscribers' under the Act."); *Mendoza v. Caesars Ent., Inc.*, No. 23-CV-03591, 2024 WL 2316544, at *6 (D.N.J. May 22, 2024) ("Plaintiff thus pleads, at best, that he created an account on Defendant's Website and obtained access to emails and other notifications as a result. Plaintiff pleads no facts to suggest a connection between this alleged subscription and access to audio-visual content on the Website."). Many others have reached the same conclusion on allegations that a plaintiff signed up for a non-video service (e.g., an emailed newsletter) that had no effect on their ability to access video content on a defendant's website. *See*, *e.g.*, *Heather*, 2023 WL 8788760, at *2 (dismissing where plaintiffs did not allege email newsletter subscription provided "enhanced access to the videos, which were equally available to all Healthline's visitors"). The consensus takeaway from these cases is the same: a subscription "of a kind that [is] unconnected to [an] ability to access video content" does not implicate the VPPA. *Gardener,* 681 F. Supp. 3d at 869.

Here, the FAC alleges nothing to connect Plaintiff's subscription to the MasterClass website to any *video*-related benefits she received as a "subscriber." As in *Kuzenski*, *Markels*, and the other cases identified above, Plaintiff alleges that she "registered" for the MasterClass website using her

Facebook account but does not connect that registration to her ability to access any of the "free prerecorded video content" allegedly present on the website. (FAC ¶ 14.) While the FAC correctly alleges that *paying subscribers* receive access to *exclusive* video content on the Website, *Plaintiff* does not allege that *she* paid for or otherwise received any video-related access. Because the FAC does not allege any facts plausibly suggesting that Plaintiff or any other "free subscriber" had any better or different access to video content as compared to any non-registered Website visitor, Plaintiff does not allege a factual nexus between her subscription and any video content on MasterClass's website. As a result, she does not allege she is a VPPA subscriber.

**2. The FAC does not allege the basic elements of a subscriber relationship between herself and MasterClass.**

Even if the VPPA did not require a "factual nexus or relationship between the subscription provided by the defendant and the defendant's allegedly actionable video content," *Tawam*, 684 F. Supp. 3d at 1061, Plaintiff's VPPA claim must still be dismissed because the FAC does not allege *any* subscriber relationship between her and MasterClass.

The Ninth Circuit has not addressed the factors demonstrating a general "subscriber" relationship under 18 U.S.C. 2710(a)(1), but district courts have consistently looked to the Eleventh Circuit's decision in *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251 (11th Cir. 2015) for guidance. In *Ellis*, the Eleventh Circuit found that a plaintiff who downloaded and used the Cartoon Network's app to view free video content was not a "subscriber," and therefore not a "consumer," under the VPPA. 803 F.3d at 1256. In reaching that determination, the Eleventh Circuit reasoned that the "common thread" running across the relevant definitions of "subscribe" is that a subscription involves "some type of commitment, relationship, or association (financial or otherwise) between a person and an entity" that is "deliberate and durable." *Id.* at 1256. Thus, the court held that a VPPA subscription would "involve some or most of the following factors: payment, registration, commitment, delivery, expressed association, and/or access to restricted content." *Id.* (citation omitted and cleaned up). Applied to the facts of that case, the court held that the *Ellis* plaintiff was not a subscriber because while he had downloaded an app and watched video content, he did not provide Cartoon Network with any personal information, make payments to Cartoon Network, or

enter into any other commitments that allowed him to access exclusive or restricted content. *Id.* at 1257. As the Eleventh Circuit summed up, the plaintiff failed to allege any "ongoing commitment or relationship between the [plaintiff] and the [defendant] which own[ed] and operate[d] the app." *Id.*

District courts have applied these "*Ellis* factors" to the same fact pattern at issue here and have found the lack of any "subscriber" relationship. *Kuzenski* is again instructive. There, the plaintiff alleged that he created a free account on the defendant's website, agreed to the defendant's terms of use, and then accessed video content on the defendant's website, which resulted in the disclosure of his Facebook ID via the Facebook Pixel. 2024 WL 5323420, at *2. Applying *Ellis*, the court held that only two of the six factors were alleged: registration and express association. *Id.* at *3. While the plaintiff argued that his agreement to the defendant's terms of use and creation of a free account evidenced some manner of "commitment" between the parties, the court disagreed because the plaintiff did not allege how either act "constitute[d] commitment," particularly given the absence of any factual allegations showing that the content offered to the plaintiff (as a free account holder) was different than that offered to any free user of the defendant's website. *Id.* The court also held that the fact that the defendant's website hosted video content did not satisfy the "delivery" factor, because it did not show that the defendant "delivered" any content to the plaintiff as a subscriber, whether in "the traditional (i.e., mailing) or digital sense (i.e., emailing)" of the word. *Id.* at *4. Rather, the video content at issue in that case was presented on the defendant's website for anyone to access. Accordingly, because the plaintiff had not alleged any facts showing payment, commitment, delivery, or access to restricted content, the court concluded he had not alleged a basic "subscriber" relationship with the defendant. *Id.*

The decision in *Sutton v. TED Foundation, Inc.*, No. 23 CIV. 9219 (DEH), 2024 WL 4167342 (S.D.N.Y. Sept. 12, 2024) reached a similar result. In that case, a group of plaintiffs created accounts with the defendant and thereafter accessed videos on the defendant's website or app. *Id.* at *1-2. The accounts provided some benefits to registrants, such as "personalized recommendations" and the ability to "sync videos across all of a user's devices." *Id.* at *1. Still, the district court found the plaintiffs did not satisfy the *Ellis* factors. Similar to *Kuzenski*, the court agreed there was evidence of "registration" and "expressed association," but found that there was no "commitment" (because the

plaintiffs had not "stated [any] specific obligation to TED," despite having created free accounts), "delivery" (because the plaintiffs did not connect their subscription to any delivery of video content to them as subscribers), or "access to restricted content" (because the plaintiffs did not allege any obligation to log into the defendant's website to access any content). *Id.* at *5-6. The court also noted there were no allegations of payment, but put that factor aside given the parties' debate about whether or not the provision of "personal information" in connection with the accounts might nevertheless qualify as payment. *Id.* at *5; *see also Gardener*, 681 F. Supp. 3d at 866, 869 (provision of names and email addresses were not "payment" under *Ellis*).

Here, Plaintiff alleges even *less* than what was alleged in *Kuzenski* or *Sutton*. In terms of basic "subscriber" facts, the FAC alleges that (i) Plaintiff was able to "quickly register" for the MasterClass website using her Facebook credentials and (ii) her "subscription" provided her with unnamed "exclusive benefits." This satisfies *one* of the *Ellis* factors: registration. But missing are any allegations showing:

- **Commitment:** Plaintiff does not allege that she made *any* agreements in connection with her registration for the Website. She does allege that she owes any obligations to MasterClass, or that MasterClass owes any obligations to her. This puts Plaintiff in a worse position than the *Kuzenski* plaintiff, who at least allegedly agreed to the defendant's terms of use and, in turn, brought the parties into some manner of contractual relationship.
- **Delivery:** Plaintiff only alleges that she accessed MasterClass's public website and the "free" content on it. She does not allege MasterClass "delivered" anything—whether video related or not—to her as a subscriber.
- **Expressed Association:** Unlike in *Sutton*, Plaintiff does not allege that she was assigned a username or other identifier that could associate her with MasterClass or its website, *see* 2024 WL 4167342, at *6 (factor weighed in plaintiffs' favor where the defendant assigned them "unique user IDs"). She alleges nothing that explicitly associated her with the MasterClass website.

- **Access to Restricted Content:** Plaintiff alleges that she was able to access the "free" content on MasterClass's website but does not allege that content was only available to free "subscribers" like her. Nor could she; the FAC specifically acknowledges that only *paying* users receive access to exclusive MasterClass content.
- **Payment:** Plaintiff does not allege she paid to register for the website. The FAC does allege that "emails and related personal information" are shared, does not state whether that information is shared with "Google and Facebook" or with Masterclass. (*See* FAC ¶ 24.) And even if the provision of personal information could stand for some manner of payment, it is not enough to overcome the absence of the remaining *Ellis* factors. *See Sutton*, 2024 WL 4167342, at *6.

In sum, Plaintiff does not allege that her status as a registrant or "free subscriber" provided her with any more or different access to the MasterClass website as compared to any non-registered user. As such, she is only marginally different than the app user is *Ellis*: she can end her so-called subscription "without consequences whenever [she] likes, and never access [the website's] content again." *Ellis*, 803 F.3d at 1257. Doing so would "have zero consequences, costs, or further obligations." *Austin-Spearman v. AMC Network Ent. LLC*, 98 F. Supp. 3d 662, 669 (S.D.N.Y. 2015) (rejecting similar VPPA claim). Plaintiff is not a VPPA subscriber.

**B. Plaintiff Does Not Allege a Knowing Disclosure of PII.**

Plaintiff's theory of PII disclosure turns on the transmission of her Facebook ID from her own browser to Facebook. But while the FAC alleges that code on the MasterClass website caused her browser to transmit her Facebook ID, those facts do not allege a knowing disclosure by *MasterClass*.

The VPPA limits only the knowing disclosure of PII. Section 2710(a)(3) provides that PII "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). An actionable VPPA claim therefore requires disclosure of "three distinct elements . . . the consumer's identity; the video material's identity; and the connection between them." *In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1095 (N.D. Cal. 2015). "The point of the VPPA, after all, is not so much to ban the disclosure

of user or video data; it is to ban the disclosure of information connecting a certain user to certain videos." *Id.*

As to her identity, Plaintiff's disclosure allegations rely on the supposed transmission of her Facebook ID to Facebook. But the FAC does not plausibly allege that MasterClass had any way of knowing—much less disclosing—Plaintiff's Facebook ID in the first instance. Indeed, while the FAC explains that by using "her Facebook account to log in to the *masterclass.com* website" her Facebook ID "was disclosed to *Facebook*," (FAC ¶ 13 (emphasis added)), she does not allege that she ever provided her Facebook ID to *MasterClass*. To the contrary, Plaintiff explains that when registering for the MasterClass website with her Facebook credentials, all MasterClass received was her "emails and related personal information." (*Id.* ¶ 24.) Indeed, the FAC alleges that visitors' Facebook IDs are stored in "one or more personally identifiable *FID cookies* on his or her browser." (FAC ¶ 34 (emphasis added).) Thus, as the "domain that wrote [these FID] cookie[s]," only *Facebook* can access their contents. *In re Hulu Priv. Litig.*, No. C 11-03764 LB, 2014 WL 1724344, at *4 (N.D. Cal. Apr. 28, 2014) (citation omitted) ("The only servers that can access a particular cookie are those associated with the domain that wrote the cookie. That means that [a website] can read only [its own] cookies, and it cannot read . . . facebook.com cookies."). The failure to allege that MasterClass knew or could otherwise access Plaintiff's Facebook ID forecloses her VPPA claim because a party cannot "knowingly" disclose information it does not possess. *See Eichenberger*, 876 F.3d at 986 (rejecting VPPA claim where the defendant "never disclosed and apparently never even possessed" the information that would allow a third party to identify an individual); *Yoder v. Ingersoll-Rand Co.*, 31 F. Supp. 2d 565, 571 (N.D. Ohio 1997) ("It is a logical impossibility for a party intentionally to disclose information that it does not know it has."), *aff'd*, 172 F.3d 51 (6th Cir. 1998).

Moreover, the FAC only posits that code on the MasterClass website (i.e., the Facebook Pixel) "cause[d]" the Plaintiff's Facebook ID "to be transmitted to Facebook *by the user's browser*." (FAC ¶ 34 (emphasis added).) These allegations—i.e., that MasterClass allegedly "caused" a disclosure for certain website visitors—are different-in-kind from the knowing disclosures regulated by the VPPA. "Causing" a disclosure is not actionable under the VPPA: when Congress wants to prohibit "causing" a disclosure—rather than one that is made knowingly and directly—it says so

explicitly. *See*, *e.g.*, 15 U.S.C. § 6821 (prohibiting any person to "cause to be disclosed . . . customer information of a financial institution"); 10 U.S.C. § 949p-5 ("accused reasonably expects to disclose, or to cause the disclosure of, classified information"). Congress used no such language here, as it was not concerned with unintentional, passive disclosures when it passed the VPPA. It was concerned with the limited problem of intentional revelations like the one that "motivated its passage"—a video store clerk handing a list of videos Judge Bork rented to a reporter. *See In re Nickelodeon Consumer Priv. Litig.,* 827 F.3d 262, 284 3d Cir. 2016).

Nor does the FAC explain how MasterClass could have known that a passive transmission of Plaintiff's Facebook ID would have been identifying as to Plaintiff in particular. *Eichenberger* addressed similar concerns. When a customer rents a video tape from the local rental store, the video store manager has immediate and actual knowledge of everything relevant to the customer's rights under the VPPA: she knows who is affected (the customer) and what information must be protected (a record of that customer as having requested or obtained specific video materials). *Eichenberger*, 876 F.3d at 985. But if only *potentially* identifying information is disclosed—e.g., information that the customer was "a local high school teacher"—that information *might* be identifying (maybe there is only one high school teacher who is also a customer at the store), but without more detail there's no basis to assume the manager made a knowing disclosure under the Act. *See id.*

Similar issues exist under Plaintiff's passive disclosure theory. Even if code on MasterClass's website "caused" the disclosure of a website visitor's Facebook ID via the Facebook Pixel, MasterClass has no way of even knowing whether that disclosure would be identifying as to that visitor. To be allegedly actionable, MasterClass would both have to know *what* the visitor's Facebook ID was and *whether* the associated Facebook Profile had enough information to personally identify the visitor. *See Heerde v. Learfield Commc'ns, LLC*, 741 F. Supp. 3d 849, 857 (C.D. Cal. 2024) (citing *Ghanaat v. Numerade Labs, Inc.*, 689 F. Supp. 3d 714, 720 (N.D. Cal. 2023) (disclosure of a Facebook ID is not identifying absent allegations that the associated profile contains "personal information . . . that could be used to readily identify" the Facebook user)). Here, Plaintiff doesn't allege any manner in which MasterClass could possibly have known whether any given website visitor's browser contained a "FID cookie" to begin with, (*see* FAC ¶ 34), much less what the ID was

or whether the associated Facebook Profile personally identified the person who happened to be using the web browser at a particular time.

Further, even if Plaintiff had alleged that MasterClass disclosed her Facebook ID and that MasterClass had a way of knowing that the Facebook ID was personally identifying as to Plaintiff, the FAC does not allege that MasterClass knew it was disclosing information about a statutory "subscriber." The VPPA's private right of action allows suit against a video tape service provider that "knowingly discloses, to any person, personally identifiable information concerning any consumer." 18 U.S.C. § 2710(b)(1). Thus, the VPPA's plain text requires the provider have knowledge *both* that personally identifiable information is being disclosed *and* that it concerns a subscriber. *See United States v. Morris*, 928 F.2d 504, 507 (2d Cir. 1991) ("[W]ith many statutes, a mental state adverb adjacent to initial words has been applied to phrases or clauses appearing later in the statute without regard to the punctuation or structure of the statute."); *see also United States ex rel. Harper v. Muskingum Watershed Conservancy Dist*., 842 F.3d 430, 436-37 (6th Cir. 2016) (distributing "knowingly" across both elements of the reverse-false-claims provision of the False Claims Act). As used in the VPPA, "the term 'knowingly' connotes actual knowledge." *In re Hulu*, 86 F. Supp. 3d at 1095.

Plaintiff does not allege that MasterClass had actual knowledge that it was disclosing information concerning a "subscriber." While the FAC alleges that MasterClass incorporated the Facebook Pixel code into its website, which would cause certain information to be sent to Facebook (i.e., assuming such information was available to disclose, as discussed above), it does not allege that MasterClass had any way of knowing whether any person that visits the website also happened to be a registrant of the website (like Plaintiff) rather than someone "merely view[ing] videos while surfing the web." *M.K. v. Google LLC*, No. 21-CV-08465-VKD, 2023 WL 4937287, at *5 (N.D. Cal. Aug.1, 2023). Without knowledge that this-or-that viewer of its free and publicly available videos are "subscribers," there can be no knowing disclosure under the VPPA's plain text. *See In re Hulu,*, 86 F. Supp. 3d at 1095 ("'[K]nowingly' means consciousness of transmitting the private information. It does not merely mean transmitting the code.").

At best, Plaintiff alleges that MasterClass should have known that if a visitor watches free video content on its website, the Facebook ID stored in that visitor's browser may be shared with Facebook provided that (i) the person was also a Facebook user and is associated with the "FID cookie" stored in the person's browser, (ii) the person was logged into Facebook at the time a video was viewed, and (iii) the person had previously registered for the MasterClass website, but had not purchased a subscription. But such "potential, possible, virtual, conceivable, theoretical, hypothetical, or nominal" knowledge is not "actual" knowledge. *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178, 184-85 (2020) (observing "[l]egal dictionaries give actual knowledge the same meaning: real knowledge as distinguished from presumed knowledge or knowledge imputed to one") (cleaned up); *see also Guenther v. Lockheed Martin Corp.,* 972 F.3d 1043, 1054 (9th Cir. 2020) (distinguishing "actual knowledge" from "lower knowledge thresholds" such as "presumed" or "implied" knowledge).

Distilled down, Plaintiff alleges that programming on the MasterClass website causes the disclosure of information MasterClass cannot know or access concerning website visitors that it does not know and cannot identify. Under those allegations, MasterClass is nothing like *Eichenberger*'s video store manager and, here, cannot be charged with knowingly disclosing Plaintiff's PII to Facebook.

## V. CONCLUSION

The basic facts underlying the FAC do not and cannot give rise to VPPA liability. The FAC should be dismissed with prejudice.

Dated: February 25, 2025

**ZWILLGEN LAW LLP**

By: */s/ Sheri Pan*
Sheri Pan (SBN 316136)
sheri@zwillgen.com

**Attorney for Defendant**
Yanka Industries, Inc. d/b/a MasterClass